## IN THE MATTER OF THE ESTATE OF: KAREN SEWER BUGGS

P85/1993

Territorial Court of the Virgin Islands

Division of St. Thomas and St. John

October 29, 1998

Marie Thomas, Esquire, Birch DeJongh, Hindels & Hall, St. Thomas, V.I., *Attorney for the Heirs.*

Brion Morrisette, Esquire, Cruz Bay, St. John, U.S.V.I., *Attorney for the Heirs.*

Malcolm Callendar, Esquire, St. Thomas, Virgin Islands, *Attorney for the Estate.*

Ive Arlington Swan, *Judge of the Territorial Court of the Virgin Islands.*

SWAN, *Judge*

### MEMORANDUM OPINION

Before the Court are two individual but similar motions filed by the heirs of the Estate of Karen Sewer Buggs, which the Court will regard as petitions, seeking the removal of the Administrator of the Estate, William P. Buggs. The Heirs have advanced a plethora of shortcomings and failures by the Administrator in administering the assets of the Estate of which The Creque Funeral Home, Inc. ("Funeral Home"), is the major asset. The Corporation owns and operates a funeral home with the same name as the Corporation.

## FACTS

Essentially, the Administrator was first appointed and issued his Letters of Administration by a former Judge of this Court on October 3, 1993, with a bond of $50,000.00 to be posted. When the Administrator was unsuccessful in securing the funds for the bond, this Court, with the agreement and acquiescence of the heirs, entered an order on February 11, 1994, allowing the Administrator to serve without bond.

The Administrator was also the only manager of the Funeral Home from the time of his appointment as Administrator of the Estate until the date of the hearing on his removal. During his tenure, the Funeral Home has experienced severe financial losses; he has also utilized the Funeral Home's assets for his personal use. Additionally, countless receipts evidencing the operations of the Funeral Home are either unavailable or irretrievably lost.

The Court held hearings on the heirs' motions on August 5 and 7, 1998. The Administrator appeared and testified under oath. Attorney Malcolm C. Callendar, who was retained by the Administrator, appeared as the attorney for the Estate. Both Attorneys Marie Thomas and Brian Morrisette appeared on behalf of the heirs.

From the evidence elicited at these hearings, the Court concluded that the Administrator had consciously violated and abused the trust of his office as Administrator of the Estate; therefore, he must be removed.

## ANALYSIS

The decision on whether to remove an executor or administrator of an estate is left to the sound discretion of the trial court. *Sprouse v. Hawk*, 574 So. 2d 754 (Ala. 1990); *In Re: Estate of Nelson*, 794 P.2d 677, 243 Mont. 276 (Mont. 1990); *In Re: Estate of Bost*, 460 N.E.2d 1156 (Ohio App. 1983); *Matter of Estate of Humphrey*, 367 N.W.2d 873, 141 Mich. App. 412 (Mich. App. 1985).

Additionally, for removal purposes, the suitability of an administrator or executor is not limited or restricted to whether they are competent to administer the Estate nor to whether criminal or civil liability is involved. *Matter of the Estate of Heller*, 401 N.W.2d 602

(Iowa App. 1986). For example, an administrator can be removed for violating the trust of his office, for abusing his fiduciary relationship with the estate and for failing in his duties to the Estate.

The Rules of this Court and the laws of this Territory mandate that administrators and executors shall promptly after their appointment, whether by letters testamentary or by letter of administration, make and file an inventory with the Clerk of the Court, verified under oath, of all the real and personal properties of the deceased. (see Terr. Ct. R. 195 and Title 15 V.I.C. § 312). Approximately five years after his initial appointment, the Administrator has dismally failed or neglected to file an inventory of the Estate's assets. On March 11, 1998, this Court entered an order, instructing the Administrator to file the inventory by March 25, 1998. However, the Administrator has once again failed or neglected to file an inventory of the Estate's assets. Likewise, the Administrator has contumaciously failed to comply with this Court's order, by not filing the inventory as late as of the date of the hearing to determine his removal. As a result, five years after the probate proceedings commenced, no one knows what assets are in the Estate. Therefore, the Court concludes that an Administrator's dereliction in failing to file the inventory, as mandated by law, and in violation of a court order, is a sufficient basis to revoke his Letters of Administration and to remove him as Administrator of the Estate. The same conclusion appertains in cases of executors.

By the testimony elicited from the Administrator, a most disconcerting picture emerged concerning the mishandling and mismanaging of the Estate's major asset. At a minimum, this Court must conclude that the Administrator, who is a college graduate and businessman, has demonstrated a convenient, but exasperating, management style which is inimical to the preservation of the Estate's assets and which, if allowed to continue, would systematically further dissipate the Estate's assets.

The Creque's Funeral Home, Inc. constitutes ninety percent (90%) of the Estate's assets. Since the Decedent's demise, the Administrator has been unilaterally managing and operating the Funeral Homes' business. More succinctly, the Administrator has been the only managing person at the Funeral Home since 1993,

and the only person in control of the business' finances, its records, and its cash assets. The Court will scrutinize and analyze the dismal and egregious results of the Administrator's stewardship.

Since the inception of the Creque's Funeral Home Inc., its Board of Directors, which has three members including the Administrator and his brother, has convened once, several years ago. The Administrator appointed both himself and his brother to the three member Board of Directors. Therefore, the Administrator and his brother constitute the majority vote on the Board. The Administrator also appointed himself as President and Secretary of the Corporation, which is an express violation of local law in that no one can hold both positions simultaneously. (see Title 13 V.I.C. § 69). By concurrently occupying three strategic positions at the management level of the Corporation, the Administrator was able to exercise enormous control over the Funeral Home's operations while being accountable to no one within the Corporation. Therefore, the Funeral Home became his personal domain.

Importantly, the Court finds that the Administrator has lamentably failed to discharge his fiduciary duties and responsibilities to the Estate, in that he has failed to preserve, protect and safeguard the assets of both the Estate and the Funeral Home. What was once a viable and striving Funeral Home business has now financially deteriorated to the point of bankruptcy under the Administrator's management. For example, the Funeral Home license to operate was in jeopardy when it could not afford the cost of the license. The business can no longer afford to pay its employees' salaries, nor honor its obligations to creditors. Similarly, the Funeral Home became delinquent on all of its tax obligations.

The Administrator is the President and Secretary of the Creque's Funeral Home, Inc., as well as the sole manager of the Funeral Home. He is also the only person authorized to write checks for the Funeral Home on the business' checking account. He has exercised absolute control and custody over the business records, including all receipts incurred from the operation of the Funeral Home. But, in spite of his autonomous control, countless receipts the Administrator had in his possession are missing or cannot be located. Accordingly, one would encounter extreme difficulty in preparing an accurate financial statement for the Funeral Home.

155

Under the Administrator's management, and by his testimony, the Funeral Home has failed to make a profit for the years 1994, 1995, 1996 and 1997, despite the tax return for 1997 revealing a small profit. Likewise, another year of financial losses in 1998, with disastrous results, is forecasted by the Administrator.

The Administrator made a Forty Thousand Dollars ($40,000.00) personal loan to the Funeral Home, ostensibly and in an effort to infuse cash into the business in order to stabilize the business' cash flow. Distressingly, absolutely no documentation exists or was created to verify the existence of the loan. There is no promissory note, lien or mortgage evidencing the loan. No one knows how the money from the loan was infused into the business, whether by a lump sum payment or by incremental installments. No corporate resolution or minutes from the Board of Directors meetings are available to verify the loan. No written authorization exists for obtaining the loan. The only evidence of the loan, which is questionable, are the Administrator's self serving testimony and his inclusion of the loan in the inadequate financial statement for the Funeral Home. At the time he testified, the Administrator did not know whether the loan bore interest or was an interest free loan. Nonetheless, he anticipates being repaid at some future date.

The Administrator created an insurmountable conflict of interest. In negotiating the loan to the Funeral Home, he simultaneously represented himself, the Funeral Home and the Estate. Whose interest did he seek to advance and protect during the negotiations for the loan? He made the decision that a loan was needed; he determined the amount of the loan and from whom it should be obtained. These decisions were made by the Administrator on behalf of the Funeral Home rather than by the Board of Directors. He then decided, on his behalf, that he should make the loan to the Funeral Home. The Administrator's decision to make the loan was based upon confidential information about the Funeral Home, which he obtained by virtue of his position as Administrator of the Estate and as a result of his fiduciary relationship with the Funeral Home.

Pursuant to the Administrator's decision, the Funeral Home does business on a regular basis with Bugg's Funeral Home in Melbourne, Florida. Bugg's Funeral Home is owned by the Ad-

156

ministrator's brother, Bruce Buggs, who is also a member of the Funeral Home's Board of Directors. In his testimony, the Administrator asserted that he experienced difficulties with his large suppliers; therefore, he was compelled to do business with his brother's funeral home in an effort to save Creque's Funeral Home. How can the Creque's Funeral Home do business, at arm's length, with another funeral home when the owner of the other funeral home sits on the Board of Directors for the Creque's Funeral Home? Did the Creque's Funeral Home receive the best business deals available in dealing with the Buggs' Funeral Home as opposed to another funeral home? Importantly, during his testimony, the Administrator did not, or conveniently could not, recall the volume of business that the Creque's Funeral Home did with Buggs's Funeral Home during the past years under his stewardship. The possibility is extremely remote that the Funeral Home would have ever done business with the Bugg's Funeral Home if someone other than William P. Buggs was the Administrator of the Estate. Undeniably, the Administrator utilized his position as Administrator to bolster the sales of his brother's business.

The Administrator asserted that when he did receive a salary from the Funeral Home, it was $25,000.00 annually. But, the tax return statements for the Funeral Home, which were completely based upon information furnished by the Administrator, reveal a salary of $44,200.00 for himself in 1996 and 1997. He takes exception to the $44,200.00 which was verified by a certified public accountant firm which he hired. Moreover, the $44,200.00 salary was determined from financial information supplied by the Administrator.

Outrageously, the Administrator paid himself by cash and never by checks, even though salaries are an operating expense of the Funeral Home. Significantly, ninety percent (90%) of the operating expenses of the Funeral Home is paid by checks but conveniently the Administrator's salary is not. The practice of having the Administrator paying himself or his salary by cash casts a defining shadow of suspicion on the practice. Only the Administrator's self-serving representation exists as verification of his salary. Lamentably, no credible supporting documentation exists to verify the amount of his salary. Everyone, including the Administrator,

knows the importance of cancelled checks as evidence in verifying expenses paid by a business. Yet, the Administrator deliberately avoided this acceptable business practice.

The Administrator has hired his fiancee as the office secretary and sometimes temporary manager for the Funeral Home. Because of the dismal financial status of the Funeral Home it can no longer afford her salary. Thus, the fiancee is allegedly performing a full seven to eight hour work day without any compensation or emolument for her efforts. The Court does not believe that the fiancee's altruism is without a cost to the Funeral Home, because she is but the *alter ego* of the Administrator. Being mindful of how the Administrator operated the Funeral Home, can anyone believe that on a regular basis his fiancee would work assiduously without a salary or any other form of compensation for a business in which she has no interest or ownership?

The Administrator has deliberately failed to operate the Funeral Home consistent with the most fundamental business practices. He has eschewed any procedure that would safeguard and protect receipts and revenues generated by the Funeral Home's operations. For example, an untold amount of receipts from the operation of the Funeral Home are missing or permanently misplaced by the Administrator.

Telephone bills from the operation of the Funeral Home cannot be found; therefore, one is unable to determine whether long distance telephone calls paid by the Funeral Home were for the Administrator's personal calls or for business calls in connection with the Funeral Home's operation.

In his travels outside the Territory, the Administrator has consistently failed to keep the receipts of expenses incurred on behalf of the Funeral Home separate from receipts incurred for his personal expenses. From his sworn testimony, this Court concludes that numerous expenditures which the Administrator charged to the Funeral Home's account were incurred as personal expenses and for his personal entertainment during his travels outside the Territory. For instance, personal expenses charged to the Funeral Home's account were incurred by the Administrator at Sam's Club, Wal-Mart, J.C. Penny and Gonzales Padin Department Store. Additionally, numerous other personal expenses by the Adminis-

trator appeared on the financial statements of the Funeral Home. If, following appointment, an executor of administrator advances his self-interest at the expense of the Estate, the Court has the power to remove him. *Estate of Backer,* 164 Cal. App. 3d 1159, 211 Cal. Rptr. 163 (Cal.App. 3 Dist. 1985).

The Administrator's method of operations of the Funeral Home has consciously obfuscated its financial operations; therefore, no one can discern or evaluate whether the Funeral Home is profitable or operating at a loss except when funds are unavailable for general operating expenses. The statements the Administrator filed in this case, as professed financial statements, are grossly inadequate and painfully deficient. They lack fundamental information from which one can make an informed decision or conclusion regarding the operations of the Funeral Home.

The Administrator has commingled the Funeral Home's funds and assets with funds in his personal savings account. For safekeeping, he has deposited the Funeral Home's funds into his savings account, and the records of such transactions are solely in the Administrator's custody. Only he knows the frequency of these deposits and the exact amounts of the Funeral Home's funds which were deposited into his personal savings account. As anticipated, the record-keeping on the deposits is in disarray; therefore, the total amount of these deposits is not readily ascertainable. Of course, only the Administrator can withdraw funds from his savings account.

The commingling of Estate funds with his own funds is one of the most egregious violations of trust a fiduciary can commit. Irrespective of the reason for the deposit, the funds in the Administrator's personal savings account would be regarded as his personal assets by everyone, even though the funds in the personal account include the Funeral Home's funds. The commingling of the Funeral Home's funds with those of the Administrator's could only have led to the further exacerbation of the Funeral Home's deepening financial woes. Accordingly, this Court holds that when an administrator consciously and deliberately commingles the Estate's cash assets with his personal cash assets, such commingling of funds warrants the immediate removal of the administrator and a revocation of his letters of administration.

This Court further holds that when an administrator has violated the trust of his office with conflicts of interest, utilizing the Estate's assets for personal use, and commingling the Estate's cash assets with his own, he must be removed.

Both an executor and administrator have the duty to preserve and protect the Estate for the benefit of all interested parties and if they breach that duty, they may be removed by the Court. *Estate of Wenzlick,* 715 S.W.2d 262, (Mo. App. 1986) The Administrator in this case has followed a course of action which is inconsistent with the trust bestowed upon him as Administrator and incongruous with protecting the Estate and its assets.

## CONCLUSION

■ The Court concludes that the Administrator has failed in his fiduciary duties and responsibilities to the Estate. Additionally, the Administrator has been unfaithful to his trust and must be removed. 15 V.I.C. 240; *Matter of the Estate of Below,* 3 V.I. 448 (D.C.V.I. 1958). Simply, he must be removed *forthwith,* in order to safeguard the remaining but meager assets of the Estate and to prevent any further diminution of their values. Accordingly, the Administrator will be removed effective 8:10 p.m., Friday, August 7, 1998 as announced from the bench. An appropriate order will be entered.